v. San Jose Police Officers. Good morning, Your Honor. My name is Wilifer Bofa and I appear on behalf of the planner. Could you pull that? I can barely hear you. Could you pull that just a little bit closer? Better? Does that work? Thank you. And I'm appearing on behalf of Appellant Lieutenant Lindemann in this matter. The issue on appeal before this Court is a very narrow one, and that is whether Lieutenant Lindemann is entitled to qualified immunity for his conduct of giving directions to certain leaders of search teams that contact him during certain searches. It is our belief that in applying the principles of the case law applicable to qualified analysis, qualified immunity to the particular facts of this case, we will be able to show that Lieutenant Lindemann did not violate the constitutional rights of the Hells Angels and that the Hells Angels failed to meet their burden of proof that the law was reasonably clear at the time to show that Lieutenant Lindemann's conduct was unlawful. As to the pertinent case law, the Supreme Court in San Jose here specifically stated that in addition to finding a constitutional violation, there was a second step that requires the Court to determine whether the contours of the specific right in question was sufficiently established to put the officer on notice that his or her conduct was unlawful. The Supreme Court in Hope again reiterated the principle in saying, or asking the question, whether the state of the law was such that it was sufficiently clear to the officer that his or her conduct was unreasonable. And also this Court held in the subsequent Sorello's decision that even though this Doe case was required that holds the specific conduct in question unlawful, the pre-existing law must be such that the officer would have known that his or her conduct was unlawful. As to the particular facts of this case, there are a few facts that I believe are important. The first one is the searches that were conducted in this case happened at 14 different locations. Lieutenant Lindemann was not present at any of these locations. The searches were conducted by a number of different law enforcement agencies. Some of the searches involved entry into the houses with SWAT teams. And in addition, the searches were conducted as part of an investigation into an alleged homicide by a member of the Hells Angels. Then second, the warrants in this case specifically calls for any evidence of membership in or... That doesn't mean all evidence, does it? It says any. It doesn't mean all. Does any mean all? There are two popular definitions of the word, if you look in a dictionary, any. And the one says all. It is the undetermined amount which includes the maximum or a whole. If it didn't mean all, it would almost surely be an invalid warrant, would it not? Excuse me? If it did mean all, it would almost surely be an invalid warrant, would it not? Well, not necessarily. In order to have shown that the specific members were closely affiliated with the Hells Angels, I believe there was a showing necessary that they were closely affiliated. There's no need to pick up anything more than a sample to demonstrate this. And we have the Eighth Circuit case, which suggests that indicia warrants of this kind in particular have to be limited to what's really necessary because there are First Amendment associational rights and so on. So read the way you want to read it. I understand that the warrant was held valid, but it was held valid, it appears, on an assumption about what it means and what it must mean to be valid. Well, the problem is when a reasonable officer would read the warrant, he or she can interpret it as meaning all or everything. So they have some discretion to interpret the warrant then, huh? Well, actually they don't. And if you read it as meaning all, they have to take everything. So then any means all. They had to take everything. Well, that is one of the two reasonable interpretations that an officer could have exercised. But it wouldn't be a legal warrant if it read that way, which ought to be some indication of how it must be read. Well, in this case, the district court has already held that it was a valid warrant. Valid warrant because he understood it as meaning any person who is cognizant of the law ought to have to read it that way because otherwise you'll have exactly what happened here, which is to take enormous, enormous amounts of things destructively when there was absolutely no law enforcement reason for doing it. Your Honor, though, on the other hand, there was no case law at the time that told Lieutenant Lindemann that it was unlawful to seize or to order. Any law enforcement reason why they needed what they took. Could anybody have thought that? Could anybody have thought that they needed to have the concrete chopped up in front of somebody's house in order to prove their point? Or remove the refrigerator door from the- Well, again, the problem here is Lieutenant Lindemann was not at the site. He did not actually observe how much what was taken or exactly what was taken. He had calls about specific things. What did he get calls about? He did. Did he get a call about the refrigerator door? I don't believe about that, but he did get a call about the portion of the concrete that contained a roster of the Hell's Angels. And the officer who called him, as the record indicates, actually prompted him, you know, I do have to take this. Is that correct? And he just confirmed. He said, if it complies with the terms of the warrant. And that same officer who actually made a decision to remove the concrete block testified, as the record will show, that he knew that it was up to the team leader's discretion which items to take and which items not to take. It was just impossible for Lieutenant Lindemann to- Say that again. It was up to the team leader's discretion to decide what to take and what not to take? It was up to them to decide what to take and what not to take. So they did have some discretion about whether or not to take the refrigerator door. Well, I didn't necessarily mean discretion. It was really up to them to decide whether something should be taken or whether it should not be taken. Did they leave anything behind, by the way? I believe they did leave something behind. I don't believe many items. Some items, I think that most items that comported with the terms of the warrant have been seized at the different premises pursuant to the terms of the warrant. I have a sort of conceptual question. Before this case, I had never understood a warrant as being an order to take what is under the warrant, as opposed to authority to take it. Is there any law or indication or case law which supports the notion that a police team or a police person in possession of a warrant must take anything covered by the warrant, as opposed to what's authorized to? I'm not aware of any such case law. I am, though, ever aware of the Moran Supreme Court case that says you cannot use your discretion in executing a search warrant. I mean, it's a reason for more specificity, and you're using these to argue essentially for less. In other words, you're using this to say that the police have to take anything that comes within the terms of the warrant. So if the warrant says, you know, search for records, they have to take all of them. They have to, even if they're unseen and they know it makes no sense. I agree that it's a more accurate interpretation to say that they are authorized to do it, and in this case, because they were authorized, they believed it was necessary because that is what they believed the warrant was for. But your whole argument all the way through has depended, it seems to me, on the notion that they must take it, that they have no discretion. Well, again, I don't believe they had discretion in how much to take, and I also don't think it was their decision. Especially Lieutenant Lindemann was in charge of the investigation, and he knew of the purpose why these items were seized. All the more reason why he should have known that they needed a little bit, a very little bit. They certainly didn't need what they took. But, again, Lieutenant Lindemann was not present at any of these sorting locations. He just fielded a few calls that came to him. He wasn't aware that they were taking truckloads of stuff? I'm sure that he knew that many items were taken, but exactly how much there was at any residence, I do not believe he knew that. I mean, specifically to say where we're going to put this stuff, it's so much. Right, and that's why I do believe that he knew that a large amount of items were being taken. Counsel, in answer to Judge Berzon's question, isn't the answer in the language of the search warrant that you are therefore commanded to make search premises, dot, dot, dot, and if you find the same or any part thereof to hold such property in your possession? Does that answer that question? In other words, the search warrant under your theory tells the officer not only to search but to take and hold any part of the described evidence, right? Exactly, and I agree with that interpretation of reading of the warrant itself. But you said earlier that there was some discretion by the team leader to decide what to take and what to leave. Well, again, I think I corrected that and said I didn't mean to say discretion. But now they don't have any discretion. Right, no, they don't. So everything that they saw that had an indicia of hell's angels on it, they had to take. That is what they believe was, and whenever they had a question whether something should have been taken. That meant they had to knock down doors, crack the cement, remove parts of furniture. Go for it. Well, Your Honor, and again, the brief. That can't possibly be. Well, I agree with that, Your Honor, but the brief of the hell's angels indicates that a significant amount of items have been destroyed, and that's absolutely incorrect. In reviewing the entire record on appeal. How about at least damaged? Actually, the actual wood that they used was destroyed in the brief, and there was no destruction. I would put the refrigerator door back on the refrigerator. Right, I don't know how I assumed that happened. Or the concrete, I guess. Well, actually, the block of concrete was a small portion that was cut out. Whether it's a small piece or a large piece, it was damaged. It was destroyed. It was taken out. Well, I believe that is something that could have been replaced back. I don't know if it actually was, but I think. Did they go back and replace it? I'm sure they did not go back and replace it, but I believe it might have been replaced by the hell's angels. Did you want to say something? Were you sharing time with your co-counsel? I am sharing time, yes, Your Honor. Thank you very much. Okay. Good morning. May it please the Court. My name is Cliff Greenberg. I represent the San Jose defendants. We're sharing time because of the consolidation, but obviously we have much different issues. Our issues involve shooting dogs. Our issues involve also similarly to the county defendants qualified immunity, but in a much different context. In this case, in this situation, we know certain things about what the law says with regard to shooting dogs. What the law says is that law enforcement officers must act reasonably with respect to the shooting of a dog. In other words, you may not shoot a dog with no legitimate governmental purpose. We know that. But that's all we know about the law of dealing with a dog in the context of a police search pursuant to warrant. So therefore, it is our argument, and I think it's fairly undisputed, that the law is completely absent with respect to this particular circumstance. In fact, it doesn't come anywhere near this particular circumstance. Well, you would agree you can't destroy, unnecessarily destroy property, personal effects, would you? Correct. Under the law. That's pretty clear. And that is clear. And that's the key word. What is necessary under this circumstance? Well, let me ask you this. They knew about the existence of these dogs before they executed the search. Yes, sir. Even before they applied for the search warrant, correct? The second search warrant. That's unclear from the record. The city, the city... But before they went out to execute both of these search warrants that are at stake here, they knew the dogs were there. Absolutely. And they knew they were big dogs. Absolutely. Dobermans and what was it, Mastiff? Bull Mastiff and... Rottweiler. Rottweiler. I'm sorry, Rottweiler. Big dogs. Big dogs. Not little tiny dogs, but big dogs. Exactly, Your Honor. And they knew that they were used as guard dogs. Yes, they did. And they had no way of trying to figure out what to do with the dogs without killing them? That's an interesting issue, Your Honor. There is no evidence. That would be a different story. If they had gone down and gotten the warrant and they had to go execute it and they show up there and there's these vicious dogs growling at the gate and they didn't know about it and they had to execute the warrant. That's exactly right, Your Honor. Let's say, let's take a more extreme situation. For instance, I posited one in the brief where you do need to move instantly because evidence of some serial killer or the killer himself or whatever is so necessary to deal with right now. And you know you're coming up to a dog situation. No one I don't think would say, no one would say that it was unreasonable to shoot the dog under those circumstances. Therefore, how does a police officer without any guidance from this court or any court know what circumstances the court did and what don't? Let's take your very circumstances. Why was it necessary under these circumstances confronting these officers when they went out to execute the warrant to shoot these dogs? And in fact, at the one house, they shot the dogs through the fence. Absolutely. And they also say, they also, if I recall from reading this carefully, is that they wanted to be, they were coming in there quietly or they didn't want to alert anybody. Why would you shoot dogs with a, with a, you know, with an automatic rifle at the front door, at the front gate? And you just, you would alert the people inside. I think that's an easy answer, Your Honor. You're, you're, you have some alternatives. You can, you can wait and figure out what's going on with that dog or you can move fast. You can shoot the dog because you believed it was necessary. Did they use a silencer? No, but they moved very quickly after that to enter the house. And there, there's, no, they didn't use a silencer. Nor is there any evidence that a silencer or any other type of different method would have served that purpose. If I, I don't know if the judge was on, I'm sorry. Go ahead, Your Honor. There was some evidence in the record, as I recall, where one officer said something to the effect of, well, we would ordinarily or we could have take, brought a humane officer with us. An officer from the Humane Society. Somebody, somebody with us. There was no evidence that that has ever happened in a circumstance anywhere near this kind of circumstance. The question was simply, can you get a animal control officer? And the answer was yes, but it wasn't specific to this situation. In fact, the officer said that they would never bring such an unqualified non-law enforcement purpose into a high-risk situation like this. Well, it wasn't high-risk when they were shooting people through the gate. I mean, in other words, when they came and they were shooting them through the fence, they certainly could have asked whether there was some way to shoot them with something that wouldn't have killed them. Your Honors, I believe that you, as this Court with the Ninth Circuit in this situation, will indeed explain to the world what should and shouldn't happen in terms of what a police officer should do when confronting a dog situation. That does not answer the question of qualified immunity. It's really quite unusual because of the week's lead time. I mean, I would agree with Judge Pius that in most other situations in which you can imagine, in which you come across a dog and don't expect to come across a dog, and there is an exigency, that it would be quite different. But here we have a situation where they were thinking about everything else about this search, and they had no plan for dealing with this dog. I mean, essentially, they knew they were going to kill the dog. There was nothing they could do. They were not going to get into those houses without killing the dog. And the Court may indeed say that after the fact of this case, that they should have considered that factor. But what's important in the qualified immunity analysis is that no one has ever said anything close to that before. No police officer, certainly in San Jose, even had an inkling that they should have been doing anything differently under the Constitution. Well, our law is pretty clear. They know they can't unnecessarily destroy property. And that is absolutely correct, Your Honor. But in this situation, just like in many, many qualified immunity situations, the Court says here's what the rule is, and you're going to apply that rule in the future, but an officer would not necessarily have known what the law was. And, you know, I cited – I have this vision in my head, which is probably imaginary, of seeing lots of movies in which, you know, the police are coming in and they have things they shoot the dog with that sort of, you know, makes the dog fall down. I've seen movies where they shoot the gun out of the hand of a person, Your Honor, and it's not true in real life. And there's no evidence at all about what is true in real life in this case. Well, pardon me, Counsel. This is a little bit more of a procedural question. But didn't Judge Fogel find that there was a tribal issue of fact as to whether the policeman acted reasonably? And all that I'm reading is the officers planned to isolate or incapacitate the dogs but did not bring pepper spray, muzzles, tranquilizers, or any items to aid them in doing so other than their weapons. Right? Now, whether he's right or wrong on that, aren't we barred from considering whether there is any evidence or not under the case of Johnson v. Jones, which says that under the appeals of 1291 collateral orders, the determination of a trial judge as to whether there is an issue of fact which bars summary judgment relief? Absolutely. That point is correct, Your Honor. But in this situation, there is no disputed issue of fact that we're dealing with. Well, there is because you're saying that in real life, all of these things that Judge Fogel found really don't help under the situation. You can't use tranquilizers, pepper sprays, muzzles, or plan on how to stop the dogs. Isn't that what you're saying? Judge Fogel, as do the plaintiffs, made a conclusion based on no facts at all, Your Honor. Yes. So you're saying Judge Fogel didn't have any facts upon which to come to the conclusion that there was a disputed issue of fact. And that's precisely the situation of Johnson v. Jones saying as a matter of court administration, we're not going to consider that under 1291 collateral order appeals. Even if that was true, Your Honor. Well, that disposes of the issue. No, because of the qualified immunity issue. The qualified immunity is an issue of law. It says we're going to assume all these facts, and still, if there is no clear law on it. Your legal position is, and I think this is your legal position, that even if there were reasonable other ways to deal with the dogs, they didn't have to use them because they could, or at least they didn't know they had to use them. Absolutely, Your Honor. They could, they had qualified immunity if their understanding of the law was that they can come in and kill the dogs. If a reason, well, if there's, I wouldn't say it that way, if there's no clear law that establishes that this was wrong and they were not on fair, reasonable notice, then yes, they are entitled to qualified immunity. To take Judge Bea's point and then plug it into the legal context, that's where we are essentially, that what we have to decide at this juncture is whether your clients reasonably believed that, or whether there was any clear law or whether they reasonably believed that even if there were other things they could have done, it was okay for them to kill the dogs. And that's a fair question, but that's the question. Yes, Your Honor. I would want to, I know my time is up. I want to point out one case. Answer Judge Bernon's question, please. Excuse me? You can address your question, please. Well, I actually wanted to point out one case that wasn't cited because it was so new that I wanted to bring to the Court's attention. What's that? It's called Graves. I'm sorry? Graves, G-R-A-V-E-S versus Coeur d'Alene, Idaho. It's August 1st, 2003. I only have a Westlaw citation for it. But it deals with the interesting issue of when a police department arrested someone at a pro-Nazi parade, and the person was arrested because he had a backpack that he wouldn't show to the officer. And the officer said, well, I thought because of the situation, because of the incendiary nature of what was going on here, that I had probable cause. This court said, no, on reflection, you do not have, you did not have probable cause. But this officer was entitled to qualified immunity because there was no court guidance on how much weight to give the particular incendiary circumstances of this. No court had ever said, well, if you have these kinds of incendiary circumstances, you should give it this much weight in consideration of all the normal Fourth Amendment probable cause issues. And that is exactly what we're dealing with in this case. There is no case that talks about how much weight to give a search warrant situation where you're looking for murder, evidence of murder, as opposed to any other kind of search warrant situation. I thought they were looking for evidence for the enhancement. These police officers had no idea what the affidavit said. They just had a warrant that said evidence of murder was part of what they were looking for, was a videotape of the actual murder. They didn't know whether it existed or not. They didn't know whether Judge Fogle was going to later rule that that was not a proper search warrant. They were allowed to say that's part of what we're looking for. And so this Court will be able to say what you can and what you can't consider and how much weight to give it. But the police officers acting at that time had absolutely no guidance on that, and I think that informs the qualified amendment issue. Thank you. Thank you, Your Honor. Good morning. May it please the Court. Karen Snell arguing on behalf of all plaintiffs, and I will be addressing both of my opponents and I will not be sharing time. Okay. Go ahead. This is a case brought to enforce and maintain the Fourth Amendment's prohibition on unreasonable searches and seizures. The district court reviewed the evidence consisting almost entirely of the defendant's record and the defendant's deposition testimony and determined that the San Jose officers who shot my client's dogs and Sergeant Linderman, who was responsible for the seizure and retention of truckloads of property, had violated plaintiffs' constitutional rights. The district court further found that Ninth Circuit case law prohibiting unnecessarily destructive conduct in the course of executing search warrants gave defendants fair notice that their conduct was illegal at the time they engaged in it. Let's just get into this for a minute. Under Sase v. Katz, we follow the two-step analysis for analyzing qualified immunity, and we take all the facts in the light most favorable to the non-moving party, to your clients, and then we ask whether or not, if those facts can be proved at the time of trial, there is a constitutional violation. If the answer to that question is yes, then you ask was the law clearly established at the time of the incident, at the time of the conduct in question. And I guess from what I understand from the city and county's arguments, we're really focused on the second step in that analysis. From what I gather in both of these incidents, although I'm not quite so sure, because let me ask you, what is your best case? Let's take the dogs first, which you'd point to and say, if a reasonably enlightened police officer would, you know, you don't have to read it, but I mean, you know, assuming that they did, you know, they would know that if they shot the dogs under these circumstances, that it would be unlawful. What should I look to? Well, starting with the dogs, the best case, or the most closely analogous case factually, is Fuller v. Vines. That's a Ninth Circuit case. Would you repeat that name? Certainly. Fuller, F-U-L-L-E-R, versus Vines, V-I-N-E-S. It's a Ninth Circuit case from 1994. And in that case, the court held that dogs are effects that are subject to seizure under the Fourth Amendment and that to shoot and kill a dog is to seize it. The facts of that case were it was a large dog, a Great Dane, that was in its neighbor's yard. The police officers were not executing a warrant. They were investigating a matter. They walked by the yard. According to the officers, the dog lunged at them. According to the homeowners, the owners of the pet, the dog stood up and the officers shot and killed it. And this court held that the plaintiffs were entitled to go to trial, which they did. But it was not entitled to qualified immunity. That's correct. This court held that. So that case is pretty darn close from a factual standpoint. Now, with regard to the more general principle, and the Supreme Court has repeatedly held and indeed held in hope that the fact that something's general, a principle is general, does not mean that it's inherently incapable of giving notice. And in that regard, the best case I've found for our position is actually one cited by the county. Let's go back to Fuller. Isn't the problem with Fuller at this juncture goes back to the procedural posture and the fact that since there was a conflict in the evidence as to whether the dog lunged, you have to take it on the plaintiff's version, which is that the dog didn't lunge. That's correct. Therefore, it's not precedent about a dangerous dog. I mean, there's no dispute here that these dogs were dangerous. Well, there is a dispute about that because they were behind fences. And I've read every dog case out there, and there are a few. And I think if you combine the briefs, you'll find about ten. But there's a strong distinction made between dogs who are running loose and who are posing a public threat and dogs who are fenced and whose owners may be present. We're starting from the premise, weak in some ways as it may turn out to be, that they had a right to go into these premises to execute the warrant. So it's not a situation in which they were just wandering by and shooting a dog through a fence. They were wandering by and dealing with the fact that they had a legitimate right to get into the building. That's correct. And it's subject to an analysis that is used in excessive force cases repeatedly, the balancing test. On the one hand, you balance the intrusion on the plaintiff's Fourth Amendment rights. In one of the recent cases, the city cites Altman, Altman v. City of High Point. The court points out that dogs are called man's best friend, that people have emotional relationships with their dogs. And that's certainly clear from the record here. My clients love their dogs. They weren't temporarily deprived of them. They were permanently deprived of them. So you have a serious intrusion on the one hand. On the other hand, you have, well, in looking at the law enforcement countervailing position, the touchstone is necessity. The cases repeatedly say that. You have to look at whether it was necessary for the officers to intrude. And what makes this case unusual is that at the point they were standing there with whatever, it was necessary. But the issue is whether they had an obligation to prepare so that it wouldn't be necessary. Well, precisely, Your Honor. And as I think Your Honor pointed out, the key to this case is that they had a week to prepare. They had a week during which they knew there were large dogs on the premises. What this backs us up to is back where we were before, which is what is the evidence in the record as to what they could have done instead? And does that matter? Does it matter whether there was evidence in the record? Well, first of all, let me go through the evidence. And with regard to whether it matters, yes, it does. Because under both Chiu v. Gates and the Headwaters case, this Court has previously held that it's important to look at alternatives in determining reasonableness. Right. But if we conclude that there's not much evidence or no evidence of – well, let's go over that. Okay. Well, let me go through the evidence. And let me also point out that all of this evidence is from the officers themselves. It's from their deposition testimony. According to the officers, they could have called in animal control. But according to one officer, despite having a week to plan, they didn't think of calling animal control until after the dogs were dead, at which time they did call in animal control. They could have used pepper spray. According to an officer – Tell me this now. What is animal control, and what is the evidence of what animal control can do against the type of dogs who are here? Well, the evidence in the record is that there are chemical agents, and there are also tranquilizers that could be used. But animal control's a way of handling dogs? There wasn't substantial testimony about this. So it was just the term, animal control, is if animal control could wave a wand and do whatever it pleases, right? Well, they could – But where's the evidence that animal control can do something with this situation? First of all, we didn't get into that because the officers never raised this issue below, that these methods wouldn't have worked. Had they done so – The burden on you to show that there was an alternative method and it wasn't used? No, Your Honor. At this stage, summary judgment, under this Court's Mills decision, the burden is on the officers to show that their conduct was reasonable. The burden is on us to show that the law was clearly established. But the burden is on them. We brought up that they talked about animal control at least being an option. If it wouldn't have worked, that was their burden to prove it at that juncture. And at this point, it's something that should be addressed in the lower court. They also brought up that they frequently used pepper spray. They had it with them that day. Why didn't they use it? They haven't told us. Was there any indication that pepper spray would do anything but get the dogs madder? There was no further evidence. I'm basically telling you what came out. The case – There was evidence that they have, on dogs, used pepper spray. Yes. And these are in our excerpts of records. I don't have the pin sites with me right here. They could have used – well, they also testified that ordinarily, when they encounter dogs in executing warrants or conducting investigations, the first thing they do is give the owner the opportunity to control the dog before considering the use of force. Why didn't they do that in this case? Because they wanted to preserve the element of surprise. And, Your Honors, that doesn't make sense. A reasonable officer would have expected the dogs to bark when ten balaclava-clad men tried to get into its yard. A reasonable officer would have anticipated that if the only way to deal with the dogs was with a shotgun, the element of surprise was certain to be lost while the officers were still outside the gate. And now let's look at the plan they did come up with, because this is clearly relevant to the reasonableness inquiry, to hope that the dogs wouldn't show up, to hope that they could scare these dogs away by poking them through the fence with the butt of their rifle, to corral the dogs having no plan as to how or where. By leaving themselves no realistic option but to shoot the dogs, the officers were certain to alert the occupants to their presence while they were no closer to the dwelling than they would have been had they alerted the residents in the first place by identifying themselves while still outside the gate. Neither the interests of officer safety nor of preservation of evidence were served by their conduct. Did they consider the possibility of using a silencer or something? They didn't say anything about that during their deposition testimony. I don't think they did. I mean, from what we know, they didn't. So in sum, the governmental interest to wait against the intrusion on my client's Fourth Amendment rights is illusory. The amount of force used was unnecessary. And that goes to... The problem is maybe the burden of proof solves the problem, but what we really have is some suggestions of things they could have done with no suggestion that any of them would have worked. I mean, they could have gone to an animal control person and they might have used pepper spray, but there's nothing in the record to demonstrate that any of that would have worked. Well, that's true. And what Judge Fogle found was the fact that they didn't even consider it was unreasonable. And that's essentially where we are at this point. If the case is... If we survive this stage and the case is remanded, I'm sure those issues will be addressed in the lower court. I suppose the rest might go to causation or to damages, but not necessarily to their reason. Is it unreasonable not to consider those things which there's no evidence of work? Well, Your Honor, when you consider that, as well as the fact that the governmental interests they claim to have been serving were not served by their conduct in shooting the dogs, because the whole point of not identifying themselves in the first place and giving the owners the opportunity to control the dogs was this element of surprise, then, yes, it was unreasonable. Well, I guess at this stage of the proceedings you could also draw an inference. I mean, you could conclude or draw an inference that they would have worked. And, indeed, you, Your Honors, are obligated to draw inferences in plaintiffs' favors. Reasonable inferences. Reasonable inferences. That's right. But one point I wanted to make with regard to the perhaps more complex issue of whether the rights were clearly established is the Marin case that Ms. Boter referred to earlier. When I looked at that for the principle that she cites it for, that officers are not allowed to exercise discretion, I quickly disposed of that. But Marin does have an interesting point. In that case, the Supreme Court, this is a 1927 case, the Supreme Court goes through the numerous statutes that Congress has enacted to restrict searches and seizures, to make certain that they're reasonable. And one statute they cite is 27 U.S.C. Section 631, which at that time provided for punishment of an officer who willfully exceeds his authority in executing a search warrant. That law is now codified in 18 U.S.C. Section 2234. Section 2234 provides whoever in executing a search warrant willfully exceeds his authority or exercises it with unnecessary severity shall be fined under this title or imprisoned not more than one year. Now, in Hope, the Supreme Court refers back to a 1997 Supreme Court case, U.S. v. Lanier. And the court talks about how the standard of fair notice in criminal cases is the same as the standard of clearly established in civil rights cases. And perhaps because I practice criminal law, that helped me in getting a grip on whether the law was clearly established here. If Linderman's conduct, if the officer's conduct was charged under this statute, would they have an argument that the statute was void for vagueness as applied or on its face? Let me ask you, Ms. Snell, two questions. Was there any single piece of evidence seized which was not responsive to the warrant? Well, yes, Your Honor. As a matter of fact, there was. And, again, this comes up in the ER, the joint excerpt of record. First of all, excuse me. If I could just get a question. To answer your question, they seized a day timer. They seized a woman's address book. They seized children's videos. They claimed that they didn't have time to review them at the site, at the home. But as a result of the massive evidence they ended up with, they never found time to review them. So they didn't return any of those items until a year and a half after, after my clients had hired lawyers and filed motions in court. So there was substantial evidence. Well, there was certainly evidence that was not responsive. My second question is this. Was there any evidence that the sidewalk was owned by your clients? It was in front of their clubhouse. That's true. But, Your Honor, I wanted to respond. Is there any issue whether that was owned by the city of San Jose and, therefore, you may not have standing? No, that was never raised. No, I don't think it was raised. But did you prove that the sidewalk belonged to your clients? Your Honor, I believe that the cement at issue was on their property. It wasn't out in front of them. Where is the record citation for that evidence? I don't have a cite to that. It was never raised below. It was never raised below. So, in other words, there was no evidence that your clients did own the property where the concrete had been put. Well, actually, there is evidence in the record in the form of the receipt for the property seized that the officers provided to my clients. That's an admission of a party litigant, the officers admitting that you own the concrete? I would submit that it is, yes. And, Your Honor, I wanted to respond to a point you raised earlier with regard to whether the officers were ordered to take everything by virtue of the warrant. The warrant itself uses the word any. And the first definition of any in the dictionary is some or a sampling. It depends on your dictionary. If you use Wetzer's Unabridged, three out of four of the definitions talk about all. And also, you'll notice that the definition of the objects to be taken are in the plural. It isn't any painting. It's any paintings. It's not any photograph. It's any photographs. Well, fair enough, Your Honor. However, when I was challenging the warrant initially, I looked at that and I thought, is it overbroad? Because in that reading, clearly the warrant would be overbroad. When you look at what they were trying to prove with this evidence, which was simply that the Hells Angels Motorcycle Club is an ongoing organization of three or more with a common sign or symbol. Did you challenge the warrant on the ground that it was overbroad? No, I didn't at that juncture because I determined that a reasonable judge would look at that and assume that an officer was intending to take a sampling. Judges issue indicia warrants every day. Officers execute indicia warrants every day. They're proving occupancy or residency. Clearly, it would be unreasonable for the officers, and no reasonable officer would think otherwise, to take every letter in someone's home. More generally, more generally, this warrant certainly uses the term command, but is the general understanding of a warrant that they must take what's in it as opposed to they can? No, Your Honor, and in fact, the... Do you have any case law on this? Actually, Your Honor, there's a case that Your Honor participated in MENA as well as Rettig. Those are two. What was the first case? MENA, M-E-N-A, and I believe it was City of Steamy, but I'm not certain of that. Any value. Where a warrant may not be overbroad on its face, but may be overbroad in its application. And I would submit that here, we don't know what Sergeant Linderman expected to find when he drafted the warrant. Perhaps he thought that they would just have their leather vests in their homes or a ring or something like that, and that by taking all of it, he would be acting reasonably. But when he got into the homes, and the record reflects... He did get into the home. He did go to one home. That was a mistake on Ms. Bote's part, as the record will reflect. He did go to the DeMello home, and that's in the excerpt of record. But he received numerous pages. We have the deposition testimony of, I believe, approximately eight of the searching officers. It's at the joint excerpt of record between pages 426 and 494. The people on the scene were instructed to page him if they had any questions, and they did so repeatedly. Because when they got into the homes, they found out that virtually everything my clients owned could qualify as evidence of Hells Angels indicia, and they stripped their homes. They had officers appeared in their cars, and they called Linderman, do I have to bring in a tow truck to take the stuff away? And he said, yes, tow their motorcycles. And there was some indicia left behind in answer to one of your questions. Ms. Snell, what objective standard is Sergeant Linderman to use to determine how much evidence is enough to prove the enhancement in trial court? Well, how do you know that? I mean, is there any evidence that Sergeant Linderman was an experienced trial counsel in criminal cases? No, but he's expected to be reasonable. By whom? By you? He's expected to be reasonable by the Constitution. But what is the objective standard of reasonability? I mean, how much is enough? How long is a piece of string? How did he know that his assistant DA would be satisfied with 10 pieces instead of 100? Well, how about a photograph of a motorcycle that's only qualification as indicia is that it has a decal on it? How about a photograph of the group? They took 100 photographs. He had called up the assistant DA and said, how much is enough? He could have done that, but I don't think he would have needed to. Well, what in his training, what in his mind of a reasonable police officer tells him how much is enough, how much is too much? How do we draw the line? The same expectation that he will exercise his discretion reasonably that Your Honor and other trial judges use when they authorize officers to get indicia of residency, indicia of occupancy. But it's also true, for example, that the standard for excessive force is a reasonable standard. We just live with that standard as something. And under Saucy, it's now a double reasonableness anyways. It would be reasonable as to whether he was reasonable. So he's fairly protected. Well, exactly. And as the Supreme Court said as recently as yesterday in U.S. versus banks, to try and devise a more specific test for reasonableness in every context that could arise in a criminal case simply doesn't work. It is based on the totality of the circumstances. And while I can't say clearly two pieces was enough or two pieces of indicia from three homes would have been enough, I can say that truckloads that required a warehouse to be rented was too much. Okay. Pressurization wasn't only too much. It's also the destruction. Well, and there was destruction. The one thing that was. Counsel said there wasn't any. Sawing off the mailbox, jackhammering up the sidewalk, taking off the refrigerator door, that was destructive. On top of that, when you pile truckloads of picture frames and plaques and motorcycles into a truck, there is damage. And there was damage. You are out of time, but I would like to go back, if my colleagues will indulge me, to the dog question on the following issue. If we were to conclude that there was not sufficient evidence in the record to sustain whatever burden you had, or rather if we concluded that the police officers sufficiently met their burden and your evidence of alternative possibilities was not sufficient, where would we be then procedurally? Judge Bea asked this question before. Judge Fogel did find that there was at least a contested issue of fact on there. And our case law, frankly, is very confusing on this. I mean, you have Johnson v. Jones, and then you have Barron's, and then you have later cases in this court, which I'm not sure where they leave us with regard to what we do if we think that there is not evidence at this juncture of reasonable alternatives. Well, if there is a factual dispute, this is a summary judgment case. And if it's material, then it should be remanded for trial. So that's the easy answer. But we got ourselves to the conclusion that while there may have been evidence that there were things they could have done, there really wasn't any evidence that any of the things they could have done would have been efficacious. And if we thought that mattered, where would we be? You would have a question as to whether the officer's conduct was reasonable or not. That would be where we would be. And so summary judgment would be inappropriate. Summary judgment is only appropriate for the officers if they convince you that their conduct was reasonable. Well, couldn't they convince us of that if they convinced us that any of the alternatives spoken of by Judge Fogel have no basis in fact as to effectiveness? If they could convince you of that, certainly. My point is that maybe we don't reach that under Johnson v. Jones. Well, and I believe that was Judge Fogel's point as well. Thank you, Ms. Snow. Thank you. Thank you, counsel. The matter will stand submitted. We appreciate the argument. Thank you, Your Honor.
judges: Paez, Berzon, Bea